J. F. BIZER, Appellant v. FLORA M. BIZER.

**Divorce:** ADULTERY: *Evidence.* To prove the wife's adultery, a witness testified to seeing her in the act with one B. Once, the husband, returning to the house unexpectedly in the morning, saw his wife leaving B's room in her night clothes. She explained that her daughter was with her, and they had withdrawn on discovering that B. had not arisen. At another time the husband left the wife and B. in the dining room and, returning immediately, found them in a bed room. B. was in bed, but the wife came out flushed and, according to her husband, began dusting. She denied this, and explained she was ironing, and merely stepped to the door to talk. Two witnesses testified to seeing the wife and B. withdrawing to a bed room several times, and closing the door, when the husband was away. Another testified to incriminating confessions by the wife, which she denied, but admitted corresponding with B. On being upbraided by the husband, she replied that her conduct was no worse than his, and denied guilt, and expressed indifference as to his suspicions. During this time she had refused to cohabit with him. B. denied criminality, but letters were produced from him to her of endearing nature, and he called on her several times with her consent after he was forbidden the house by the husband. *Held,* sufficient to show the wife's guilt.

OPINION EVIDENCE. Where a witness in a divorce suit for adultery testifies to looking through a window, and seeing the wife and a man not her husband on a bed, the admission of his opinion that they were having intercourse was proper, as the situation warranted the conclusion.

HABITUAL DRUNKENNESS: *Evidence.* In divorce for habitual drunkenness, the wife testified the husband had not been sober for five years, and that, at her suggestion, he kept alcohol in the house, so that he need not go to saloons, but she could only mention two or three times in fifteen years when he appeared visibly affected. Witnesses had seen him in saloons, and drank with him. One testified that he got to "feeling good" occasionally, and another based his judgment that he was frequently intoxicated on his shambling walk, which was due to locomotor ataxia. His neighbors who knew him from boyhood never heard of his drinking to excess or becoming intoxicated. It was conceded that he used intoxicants as a beverage before and after marriage. *Held,* not to show that he was an habitual drunkard.

*Appeal from Wapello District Court.*—HON. T. M. FEE, Judge.

FRIDAY, JANUARY 19, 1900.

THE plaintiff prayed for a divorce on the ground that defendant had committed adultery. The defendant based her prayer for like relief on the charge of adultery, cruelty, and habitual drunkenness. The petition was dismissed, and, on the cross petition, a decree entered as prayed, on the finding that plaintiff had, since marriage, become an habitual drunkard. He appeals.—*Reversed.*

*Mitchell & Hunter* and *W. W. Cory* for appellant.

*McNett & Tisdale* for appellee.

LADD, J.—These parties were married in 1882, having a daughter fourteen years old, and a son of twelve years, and separated in August, 1897,—a few days after this action was begun. During the last eighteen months they had not cohabited. She explained that her refusal was because of having contracted gonorrhea from him, and his failure to produce a doctor's certificate of his cure as a condition precedent. He denies ever having been afflicted with such a disease, and certainly the evidence falls short of establishing the necessary exposure. Doubtless, the defendant believed she was suffering from such an ailment, but her condition may be fully accounted for without the imputation of wrong doing on her part or that of her husband. The neck of her womb had been lacerated in childbirth, several years before, and from this the inflammation of the parts and the virulent discharge may have resulted. The physicians agree that leucorrhoea of long standing, which often results from a tear, can only be distinguished from gonorrhea by the use of the microscope. The opinion of the doctor first treating her is fully met by his admissions that this crucial test was never applied, and the testimony of others makes it clear that her disease probably resulted from her condi-

tion, and that it was not gonorrhea. Besides, the evidence does not warrant the conclusion that plaintiff had associated with lewd women. The only testimony tending to sustain this charge is that of a negro clerk of a house of ill-fame. Such a person is ordinarily entitled to little credit. The plaintiff denies the accusation, and is corroborated by the evidence of the defendant tending to show that he could not have been away from home that night. But she states that he admitted having a venereal disease two years after their marriage, and was treated by a physician of Kalamazoo, Michigan. The plaintiff denies this, but testified to being treated for a nervous trouble, resulting in locomotor ataxia, with which he is now afflicted. The charges of adultery and cruelty against him are not sustained.

II. Nor does the evidence warrant the conclusion that he is an habitual drunkard. That he used intoxicating liquors as a beverage before and after marriage is conceded. And the direct testimony of his wife tended to show that he had not been sober for five years, and that, at her suggestion, he kept alcohol in the house so that he need not go to the saloons. But on cross-examination she is able to mention but two or three occasions within fifteen years when he appeared visibly affected. One Peck based his judgment that he had been under the influence of liquor frequently on his shambling walk, which resulted from having locomotor ataxia. Others saw him in saloons or drank with him. His near neighbors, however, who had known him since boyhood, and saw him almost daily, and the father who reared him, never knew nor heard that he drank excessively or became intoxicated. He is shown to have been an industrious man, devoted to his business, and, even if he did get to "feeling good" occasionally, as one witness puts it, this does not stamp him an habitual drunkard. Nor to be such was it essential that he be continually in that condition. One may be an habitual drunkard, and yet remain sober for

days, and even weeks, at a time. "He is an habitual drunkard," says the court in *Com. v. Whitney,* 5 Gray, 85, "whose habit is to get drunk; whose inebriety has become habitual." In *Ludwick v. Com.* 18 Pa. St. 172, it is said that to be such he must have the fixed habit of drunkenness. The definition of the term given in *State v. Pratt,* 34 Vt. 323, is "one who is in the habit of getting drunk, or who commonly or frequently is drunk." To the same effect, see *Brown v. Brown,* 38 Ark. 328; *Magahay v. Magahay,* 35 Mich. 210; *Walton v. Walton,* 34 Kan. 195 (8 Pac. Rep. 110); *Murphy v. People,* 90 Ill. 59; *Burns v. Burns,* 13 Fla. 376; *Mack v. Handy,* 39 La. Ann. 497, 2 South 181; *Meathe v. Meathe,* 83 Mich. 150 (47 N. W. Rep. 109); 9 Am. & Eng. Enc. Law, 814. See *Wheeler v. Wheeler,* 53 Iowa, 512. In *McBee v. McBee,* 22 Or. 329 (29 Am. St. Rep. 613, 29 Pac. Rep. 887), the court, after a review of all the authorities, concludes that "there must be frequent and regular recurrence of excessive indulgence in intoxicating drinks to constitute an habitual drunkard. It is not necessary that he should drink liquors to excess, and become intoxicated every day, or even every week, but there must be such frequent repetition of excessive indulgence as to engender a fixed habit of drunkenness. Occasional acts of intoxication are not sufficient to make one an habitual drunkard. There must be the involuntary tendency to become intoxicated as often as the temptation is presented, which comes from a fixed habit acquired from frequent and excessive indulgence. The man is reduced to that pitiable condition in which he either makes no vigorous effort to resist and overcome the habit, or his will has become so enfeebled by the indulgence that resistance is impossible. There is generated in him, by frequent and excessive indulgence, a fixed habit of drunkenness, which he is liable to exhibit at any time when the opportunity is afforded. He is an habitual drunkard, because he is commonly or frequently in the habit of getting drunk, although he may not always be so. When

a man has reached such a state of demoralization that his inebriety has become habitual, its effect upon his character and conduct is to disqualify him from properly attending to his business, and, if he be married, to render his presence in the marriage relation disgusting and intolerable." This is an accurate summary of what is meant by "habitual drunkenness" as a ground for divorce, and we need only add that the record utterly fails to show the plaintiff to have the fixed habit of excessive drinking.

III. The petition charges the defendant with having committed adultery with one Burns, who had been employed by the plaintiff for a month in 1890, and during the seasons of 1891 and 1895. He purchased the wagons, cans, and good will of the plaintiff's business of retailing milk in Ottumwa, September 7, 1895, but continued to board with these parties until the sale back to the plaintiff, April 7, 1897, when, according to the latter's testimony, he was forbidden to return to the premises. The wife was advised of this, but Burns denies it, while admitting knowledge that the husband's suspicion of undue intimacy with the defendant was the occasion of the purchase. Nevertheless, he called upon her several times thereafter in plaintiff's absence, and without objection on her part. Knowing, as both did, of plaintiff's belief in their guilt, these meetings cannot be explained on the score of platonic friendship, even though there was a disparity in their ages of fifteen years. They happened to be in the forenoon, when the plaintiff was delivering milk in the city, and when the children either happened to be away from home or left soon after his arrival. For some time prior to January, 1897, the plaintiff had noticed that the window blinds toward the barn, raised by him on leaving the house, a little after 4 o'clock in the morning, would be lowered when he returned to breakfast, after milking. Burns had only to care for his team, and appears not to have arisen as early. and to have

returned to the house sooner. In that month, one Brown, who was then working for the plaintiff, at his direction, watched at the west bedroom window for several mornings. He testified that on the last the curtain was not quite down, and he saw Burns and the defendant on a bed which was across the window. To the question, "What were they doing?" he answered, "Looked to me like they were having intercourse." He remained till they arose, and saw their faces. Whether this was an opinion merely, as suggested, is not very material, as the description of the situation warranted the witness' conclusion. In *Yahn v. City of Ottumwa*, 60 Iowa, 429, the court said: "It is competent for a witness to testify to his conclusion, when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time." In *Carter v. Carter*, 152 Ill. Sup. 434 (28 N. E. Rep. 953), a witness was permitted to testify, from sounds and noises which he heard in an adjoining room, and which could not be described to the jury precisely as they appeared to the witness at the time, that he was of the opinion that the man and woman therein were engaged in sexual intercourse. Unless the witness' statement is to be received, the fact could not be testified to, except by one actually observing penetration, and we are not prepared to indorse such an absurdity. True, Brown, for fear of breaking up the family, advised the husband he had seen nothing, and on counseling with his wife,—plaintiff's sister,—concluded not to mention the matter. He is not impeached in any way, save by this report of what he had seen, and it is not at all certain that his course was not such as would have been pursued by many persons of prudence. Possibly but for the corroborating circumstances, his evidence ought not to be held to establish the fact. The defendant, however, fell into several situations requiring an account, and her explanations are not satisfactory. Besides, the conduct of a married woman ought not to be such in rela-

tion to another than her husband that exculpatory statements are continually in demand. On one occasion, when unexpectedly returning to the house for the milk pails, plaintiff saw his wife leaving the room in which Burns slept, in her nightclothes. Of course, she explains that her daughter was with her, and they were withdrawing, upon the discovery that the boarder had not arisen. But this daughter ordinarily slept till breakfast, and how she came to leave her room in that condition so soon after her husband had arisen is not satisfactorily answered. Again, about a week later, the plaintiff started to take a team to the field, leaving defendant and Burns in the dining room. He met an employe coming for it near the house, and, upon returning immediately, found them in a bedroom off the sitting room, through which they must have passed. Burns was in bed, but she came out flushed, and began dusting, according to her husband, though she denies this, and explains that she was ironing, and merely stepped to the door to talk. Two employes testify they had seen the accused parties withdraw to a bedroom several times, and close the door, when the husband was absent, and that Burns, when working for him, would remain at the house each morning longer than was required to do the chores. In March, 1897, the defendant underwent an operation at the hospital, and, while there, informed the nurse in attendance that Burns, who called several times, was thoughtful of her when unwell, and "always knew it as soon as she did, and took all precaution to help take care of her." She denies this, but admits having corresponded with him in 1892, whether at the instance of her husband being in dispute. When accused by him of improper relations with Burns, she responded that it was no worse than he had done, and thereafter denied guilt, and expressed indifference as to his suspicions. Both the defendant and Burns deny having had sexual intercourse. But we think she has failed to account for the incriminating circumstances, except as her somewhat impaired health may

tend to do so. But, even in her condition, she was able to
and did go skating at forty, and, according to the physi-
cians, her trouble did not interfere with sexual enjoyment.

Withholding herself entirely from her husband, under
the circumstances disclosed, tends to confirm the proof of
her guilt. The testimony of Burns is condemned by his
own conduct and words. Had he been innocent, he would
hardly have frequented the premises as disclosed. One
witness declared he had told him as early as in 1892 of sus-
taining improper relations with the defendant. Soon after
leaving, May 5, 1897, he addressed a letter to her, saying:
"Say darling, I know you will think I have gone back on
you; but be true to me, and I will be true to you, my love.
O, Flora, had we not to part. Well, I suppose it was the
best for you, because you are not very stout. But do you
know how I feel, for it is just killing me. ⁂ * * Dar-
ling, did you get your buttons yet? They were $1. By,
by, love. B. B. & C. Y. S. K. 10,000. From your sweet-
heart, Totise." Seven days later, in another letter, he
addressed her as "My Darling Totise," saying he would
be there Sunday, and closed with the same letters as before,
with the figures 100,000. We venture to add that Burns
defines these abbreviations to mean, "Bye, bye; and con-
sider yourself kissed 100,000 times." But this was not
enough; for he adds, by way of postscript, "Totise, darling,
dear, B. B. D. L.," which is said to mean, "Bye, bye; dear
love." Though forbidden to visit the premises, he promises
to come, and presents her with sleeve buttons, which she
accepts. His feelings are apparent from these letters, which
indicate the relation he at least supposed himself to sus-
tain to the defendant. He accounts for the letter by con-
fessing to have been foolish, and says she gave him no
occasion to thus address her. Strange that he should so
presume! A correct explanation, as we believe, is that to
shield himself, and, through a false sense of honor, to screen
her, he has not testified to the truth. See *Harrington v.*

*Harrington,* 107 Mass. 329. The defendant is shown to have been guilty. We have gone into details in reviewing the evidence more than is our custom, as the conclusion reached is contrary to that of the district court.

IV. The plaintiff was awarded the custody of the son, and the defendant that of the daughter, who is now over sixteen years of age. It is possible that the situation is such now that this arrangement should not be interfered with, and that the plaintiff ought to contribute to the daughter's maintenance and education; and it is possible that the division of the personal property made ought to be carried out. But no money as alimony should be paid to the defendant, as the property left the plaintiff will not exceed his indebtedness. We have concluded to leave these matters open for readjustment by the district court. The cause will therefore be remanded, with directions to enter decree of divorce in favor of the plaintiff, and such an order with reference to the custody of the children and the division of the property as the present situation of the parties may demand.—REVERSED.

GRANGER, C. J., not sitting.