Paul O'Donnell, Appellee, v. Elmer Holdorf and Ruby Holdorf, Trading as Evanston Riding School, Defendants.

Appeal of Elmer Holdorf, Appellant.

Gen. No. 40,877.

Heard in the third division of this court for the first district at the October term, 1939. Opinion filed April 10, 1940.

WINSTON, STRAWN & SHAW, of Chicago, for appellant; JAMES H. CARTWRIGHT, of Chicago, of counsel.

ROYAL W. IRWIN, of Chicago, for appellee.

MR. PRESIDING JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

Elmer Holdorf, one of the defendants named in the above entitled cause, brings this appeal from a judgment entered in the circuit court in favor of Paul O'Donnell, plaintiff, for the sum of $2,500, for personal injuries sustained while plaintiff was riding a horse which he had rented from the defendant. Ruby Holdorf was dismissed from the suit as it developed that Elmer Holdorf was the sole proprietor.

Plaintiff's complaint alleges that the defendant was engaged in the livery stable business and owned and rented saddle horses for hire to persons desiring to ride horseback; that on or about May 16, 1937, plaintiff rented for hire from defendant a riding horse known as Black Ace, and then and there agreed to pay the usual and customary charge for the hire of said horse; that said renting by said defendant was a warranty that the horse was gentle, tractable and well trained for horseback riding, but on the contrary was vicious, stubborn, temperamental and not well trained, tractable or gentle, which was well known to defendant and

was not known to plaintiff; that said horse reared and threw plaintiff to the ground and fell on him and thereby injured him.

Defendant's answer denies the viciousness or stubbornness attributed by plaintiff to the horse Black Ace; admits he is engaged in the business of renting riding horses for hire; denies any warranty or that plaintiff relied on it; admits that the horse, Black Ace, was on the day in question rented to the plaintiff for the purpose of riding said horse with saddle and bridle and states that plaintiff knew that said horse was only rented to persons who were skilful and experienced riders; denies that the horse, Black Ace, was not well trained or was vicious or stubborn; admits that the plaintiff represented himself as being a skilful and experienced rider; denies that the plaintiff at the time of the alleged injury was conducting himself as an experienced and skilful rider and was exercising ordinary care and caution for his own safety as an experienced and skilful rider in and about the management of the said horse Black Ace.

Plaintiff's theory of the case is that he rented a saddle horse from the defendant and was injured while riding the horse. He contends that his injury resulted from no fault of his own in the management of the horse, but rather from the vicious and ungovernable character of the horse and from his vicious habit of rearing and throwing himself over backward when one rein was pulled; that the evil character of the horse and his bad habit were well known to the defendant; that plaintiff established his case by proving the accident and the injuries and then by testifying himself, which was corroborated by his daughter; that five weeks after the accident the defendant, in a conversation at which only plaintiff and his daughter and the defendant were present, said that the horse had done the same thing before and that he had this eccentricity of rearing when one rein was pulled.

The defendant's theory of the case is that by testifying to the supposed admission, plaintiff made out the barest prima facie case; that when the defendant denied the admission and produced the testimony of himself and everyone else who would be expected to know anything about the horse, that the horse was not a vicious or dangerous horse, and that the horse not only did not have the habit of rearing, but that he had never reared before with any rider, and therefore plaintiff's bare prima facie case was completely overcome.

The defendant further contends that the plaintiff's own testimony shows conclusively that his injuries resulted from his own unskilful and improper management of the horse after he had admittedly represented himself, in hiring the horse, to be a skilful and experienced rider; that plaintiff requested this particular horse after he was told that it required an experienced rider to ride him.

The defendant further contends that it was necessary for plaintiff to prove that the horse was unsuitable for riding by a skilful and experienced rider and that he had this dangerous habit and that the defendant knew of it; that the testimony of plaintiff and his daughter attempting to establish these vital elements of his case by the supposed admission of the defendant should be given little weight, and that that testimony is completely overcome by the uncontradicted evidence in the case; that the horse was a lively spirited horse, but easily controlled and that he had never, in three and one-half months' use, misbehaved in this manner before.

This case was tried before a judge without a jury. Plaintiff maintains that he has proven his case by a preponderance of the evidence, while defendant maintains that the finding and judgment of the court are contrary to the manifest weight of the evidence.

Plaintiff testified that he was a man 54 years of age and lived in Evanston, Illinois; that he has a daughter

Rosemary who is 18 years of age; that on May 15, 1937, the defendant telephoned the Holdorf stables and talked with Mrs. Holdorf; that he told her that he wanted to get two horses for horseback riding the next day, a horse for his daughter and one for himself; that he told Mrs. Holdorf that his daughter had suggested Black Ace for him to ride and Black Rock for herself; that he asked if Black Ace was all right and she said, "Yes, if you are an experienced rider;" that he, the plaintiff, said he was; that he had never ridden nor had he seen Black Ace before that day; that his daughter told him about the horse.

Plaintiff further testified that on Sunday morning his daughter and he arrived at the stable a little before 10 o'clock; that when the horses were brought out he mounted Black Ace; that he was a big horse and had an English saddle on and had a bridle with a double bit, that is he had a snaffle bit and a Pelham bit; that he thought it was a curb bit although he has since been informed that there was no curb chain on it; that the horse had no mane as it had been clipped; that there was no martingale; that the stirrups were adjusted to his length, rather long; that he rides the old cavalry style, that is ride with long stirrups, just reached it with the ball of your foot.

Plaintiff further testified that he "was up first" and waited a minute or two for his daughter to get up; that the horse was a little nervous and pranced around a bit; that he patted him on the neck and then Rosemary was up; that her horse started to move out and that his horse started to move out; that nothing was said to him by Mr. Holdorf or Mrs. Holdorf about the horse at the time the horse was delivered to him; that he had never heard of the horse before; that his horse was fresh; that he judged that he had not been ridden that day; that he wanted to go; that he blew a little heavy, probably because he was running fast, trotting fast; that during the time he wanted to go he, the plaintiff,

held a firm rein; part of the time it was a fast trot and part of the time it was a canter; that plaintiff reached the bridge south of the golf course, went across it and some distance on the other side of the bridge is the bridle path where you ride back to the stables and then there is another sort of path or road that continues south; that when he was approaching this road that leads back east, which would be on his left as he was riding south, Black Ace kept pulling over to go back to the stable; that the horse wanted to go that road but that plaintiff guided him the other way; that plaintiff kept pulling Black Ace away from this road so as to make him continue south; that plaintiff had been riding 20 minutes; that he got Black Ace by this road perhaps 100 feet when Rosemary, who was back of him, uttered a cry as though she were scared or that something was wrong; that he saw an automobile ahead of him on that road and turned and pulled his horse to the left and up into a field and that there were no fences there; that the field was either of grass or wheat; that when he got up there he faced his daughter and she came up to him; that he asked his daughter whether she was all right and she said that she was; that he said, ''Let's go.''

Plaintiff further testified that at this point he started to turn the horse; that he was facing northwest; that the road back to the stable was on his right, a little way off, and the road he just left was on his left, running almost due north and south, that is the road he guided his horse toward; that he had no spurs and had no whip; that he pulled the horse to the left to guide him that way and hit him with his heel; that the horse pulled away to get toward the road back to the stable; that plaintiff pulled him again toward the way he wanted the horse to go; that the horse then reared up; that he held a firm hand on the rein and bit; that he seized the horse strongly with his knees for the jump as he expected; that instead, the horse went straight up on his

hind legs, until his head was in front of him with the horse's ears almost touching plaintiff's nose and the horse backed right over, almost vertically backwards; that plaintiff was astride the horse at that time and on the way down was still astride him, but that he got his feet out of the stirrups and dropped the reins so that the horse landed on him between his legs, with plaintiff's back on the ground, with the horse's back between his legs; that the horse rolled off plaintiff and that a stone or something hit him and cut his forehead a little left of his left eyebrow, his left cheek and also across the bridge of his nose; that he horse did not step on him; that plaintiff was driven to St. Francis Hospital in Evanston by Mr. Holdorf.

We quote the conversation which plaintiff testified he had with Mr. Holdorf at that time: ''On my way to the hospital I said to Mr. Holdorf 'I have been wondering what made that horse rear.' He said, 'Well, he has a tender mouth, you probably pulled too hard on the bit.' I said 'No, I was not pulling back, I was not pulling back. I was not trying to back him. I was not pulling on the bit at all. I was pulling sidewise. I was trying to get him to go to the left.' He said, 'Well, He is a spirited horse.' ''

Plaintiff further testified that on the fifth Sunday after his injury he went out to Mr. Holdorf's place with his daughter Rosemary; that he asked one of the men if Black Ace had been injured, and he said ''No''; that Holdorf sat on a bench with plaintiff and his daughter and Holdorf said he was sorry about plaintiff's getting hurt and was glad to see that plaintiff was out again; that plaintiff said to Holdorf: ''I have been trying to figure out and I can't figure out still what made that horse rear that way. What do you think made him rear?

''He said 'He has this eccentricity when he is inclined to go to one side,' I think to the right or to the left side, anyway, he is inclined to go one way, the

driver would pull on the opposite side of the rein to get him away from that direction, pull too hard, that would irritate him. I said 'Has this horse reared that way before?' he said, 'Yes, he has. He is temperamental, and he has to be handled just right. If I had been here when you went out, I would have cautioned you about him, but I was out on the bridle path with some customers.' We talked a little longer about different things. At that time he said again in that conversation that this horse was a good spirited horse, that he was a good jumper.''

Plaintiff further testified that he had been raised in Vincennes, Indiana; that he came to Chicago in 1903 and has lived here ever since; that while in Vincennes he only rode a horse in the summertime when he visited some cousins who lived on a farm; that the first time he rode a horse in Chicago was after he had joined the First Cavalry of the Illinois National Guard in the summer of 1909; that in 1916, he went into the border service as a member of the Cavalry troop and they went into regular service; that they drilled with horses twice a week after he became an officer and these drills lasted two or three hours; that his first connection with the cavalry was in 1909, and that he was continually active in it up to and through the time he went to the border; that he returned from the border in the latter part of November, 1916; that after he resigned from the army, he rode mainly on summer vacations, spring, summer and fall; that during the past few years he rode on horses from various stables in this vicinity; that once or twice when he was in the cavalry he had had horses rear up, reared on its hind feet and gave a jump forward; that he had had horses that balked with him; that he had ridden horses that were scared and that he had ridden horses who refused to go the way he wanted them to go; horses that wanted to follow their own heads and would not turn when he wanted them to; that he often had horses that wanted to go back to

the barn, a common trait in horses both buggy horses and saddle horses and that he may have had a horse that temporarily refused to go forward with him; that at Worth, Illinois, one of the boys had a horse who would not go along with the troop, he kept side-stepping; that he gave his horse to that boy and he took his; that he had quite a time with that horse.

Plaintiff further testified that he has had horses that wanted to go in a different direction to which he wanted them to go.

Plaintiff further testified that his daughter Rosemary was at that time attending Marywood school in Evanston; that she had gone with a class from that school and had been riding at the Holdorf School for some time; that a teacher, Miss DuBois, of his daughter's class had ridden Black Ace and that this teacher was the athletic instructress of that school; that they rode in the arena; that his daughter told him that Black Ace looked like a good horse and suggested that he take Black Ace; that Miss DuBois liked and rode Black Ace.

Plaintiff further testified that Holdorf had told him that he had no liability insurance and that he, plaintiff, told Holdorf that he had no accident insurance.

Rosemary O'Donnell, daughter of plaintiff, testified that she was 17 years of age and that she was present at the telephone conversation between her father and the Holdorfs on Saturday; that on Sunday she went with her father to the riding academy and got a couple of horses; that she got the horse Black Rock, which horse she had ridden before; that she had seen Black Ace before as her "gym" teacher, Miss DuBois, had ridden that horse; that she knew nothing of the habits of the horse and had never ridden it.

Miss O'Donnell further testified that at the place where the accident happened her horse stumbled or shied on some gravel and she called out and her father stopped; that it was in a rounded spot and he went up a little way off the path and by that time she had her

horse under control; that her father was again going to turn south but the horse did not want to turn that way; that the horse wanted to go back to the barn; that her father pulled the horse's rein to the left and that the animal reared up and fell over on top of her father: that the horse reared only once; that the road back to the stable went in a slightly northeast direction, mostly north and that this is the path that the horse wanted to follow.

Miss O'Donnell further testified that she remembered going over to the stables five weeks after the accident; that her father talked with Mr. Holdorf and that she heard the conversation; that her father said he had just been out of the hospital a short time and Mr. Holdorf said how sorry he was about the accident; that her father asked him if the horse had reared before; that Mr. Holdorf said the horse was rather temperamental; that if you pulled the rein he wanted to go one way and that if you pulled the rein the other way he would rear; that Mr. Holdorf said that if he had been in the stable when her father took the horse that he would have warned him; that the boys there hadn't sense enough to do it; that during the conversation at the stable her father asked Mr. Holdorf if he had liability insurance; that Mr. Holdorf said no, the people who insure thought his business was too dangerous to insure or something to that effect; that she remembered distinctly that Mr. Holdorf said that that horse had done that before; that if you pulled on one rein he was apt to rear.

Miss O'Donnell further testified that she had talked this matter over with her father several times and had told him what her testimony would be; that the first time her father talked to her about the conversation was immediately after they had left the place; that he told her to remember it; that she had talked with him several times since then; that she did not recall talking with Mrs. Holdorf about reserving Black Ace

for her father for that Sunday; that she had spoken of rides there with her father at some time but had not made an appointment; that she did not recall having asked Mrs. Holdorf if her father could have Black Ace to ride with her; that she remembered having a conversation in which she asked Mr. or Mrs. Holdorf if her father could have Black Ace, and was asked whether her father was a good rider; that as she remembered the conversation it was with Mr. Holdorf, but that she could not be sure; that she knew she talked about it and had said that her father was a good rider.

Elizabeth DuBois testified that she is a physical education instructress at Marywood school; that she is acquainted with Elmer and Ruby Holdorf; that she rides quite often at their stable; that she rode Black Ace quite often prior to May 16, 1937; that she has a class of girls that ride out of Mrs. Holdorf's stable and that she usually rode that horse in class; that she rode him in the ring and on the bridle path; that she is an average rider and that Black Ace is an average horse; that she never had any trouble with him; that Black Ace never reared with her nor otherwise misbehaved; that she never had any trouble making Black Ace go where she wanted him to go; that she never noticed any peculiarities or eccentricities about the horse; that he never tried to turn back with her; that she found no trouble with his mouth, but that it was an average mouth; that she had ridden Black Ace about 15 or 16 times.

Catherine Loucks testified that she had ridden Black Ace four times, once in the arena and three times outside when she went through the woods; that she is not positive as to which direction she went, but she just rode around the bridle paths and through Harms Woods; that Black Ace was high-spirited, but a very pleasurable horse to ride; that he never showed any signs of viciousness and that he never reared up with her; that he never refused to go anywhere she wanted

him to go. She further testified that when a horse rears up with you, you release the reins in order to give him his head to let him go down; that you do not keep pulling on the reins; that she never had a horse go clear over backwards with her.

Elmer J. Holdorf, defendant herein, testified that he had been in the horse business for approximately 18 years in training and finishing horses; that he always had between 35 and 45 head of horses and when he testified had 105 horses in the stable; that he had been in his present place of business for over five years; that he teaches people how to ride and later they buy horses of their own; that he got the horse Black Ace in February, 1937 in Moline, Illinois; that he had ridden Black Ace on many occasions over the bridle paths and trails; that he never reared up with him; that Black Ace was a three-gaited saddle horse, that is a walk, trot and canter and that he had an excellent trot; that the bit used on Black Ace was a rubber Pelham bit and that there is no gentler or milder bit on a horse's mouth.

Defendant further testifying denied that he said to plaintiff that the horse had done the same thing before, or anything like that; that the horse had never reared to his knowledge and that he never used the word "eccentricity" in his life; that it is not a smart thing to keep a tight hold on a horse if he balks; that you should give him his head; that no disciplinary measures were taken on Black Ace during the time he was in defendant's possession; that Black Ace did not need any; that the horse never kicked anybody to his knowledge nor struck at anybody with his front feet nor tried to bite anybody; that around the stable he was a very nice horse to handle.

Hilmer Setterman, testifying for defendant, stated that he first started to work for Holdorf in 1920 as a groom; that he had ridden Black Ace on three or four occasions; that the horse was not vicious and that he

never refused to go where he wanted him to go; that on one occasion he drove up to the stable where there was a big sliding door on rollers; that when Black Ace saw the sliding door he got scared and reared up, he was too close to the door and he got up and slid right up on top of it; that he, the witness, yanked him back; that he had never seen Black Ace come back home without a rider and that he did not know of any bad habits the horse had; that Black Ace had a good disposition.

Arthur Sass, testifying for defendant, stated that in the Spring of 1937 he had three horses of his own at the stable and that he had ridden Black Ace on three or four occasions; that he was learning to ride at the time and was just a beginner; that he had been told that Black Ace was a good horse on cantering; that he was very poor riding a canter and he was told that the horse could help him on that; that he rode Black Ace around the paths and through the woods; that he had no trouble with the horse and that it never refused to do a thing which a perfect saddle horse would not do.

Frank Moran, an assistant of Mr. Holdorf's, testified that he had been connected with the horse business for 15 years; that he remembered Black Ace and that the horse was about 15–3; that he was just a nice horse, three-gaited and high; that he was with him quite a while and that he was all right as far as he knew; that he had ridden him every day Mrs. Lowrey rode; that he rode him for school work, teaching and instructing; that the horse responded on the bit any way you wanted him to; that he never had any trouble making the horse go where he wanted him to go; that he never kicked, struck or tried to bite him; that he never reared with him; that the horse was well broke.

On cross-examination Moran testified that bad traits that a horse may have are kicking, biting, rearing and that sort of thing; that running away is bad and dan-

gerous; that he has ridden horses that reared; that it does not take a very good rider to "stick" on a horse that rears; that if you know how it is very simple, with an English riding saddle, to correct this; that when the horse rears you just turn his head and lean forward; that you grip the horse with your knees; that they never had a horse that would lie down on you; that some horses after they are frightened, stop and look; that if a sudden noise or something unusual confronts a horse, sometimes he will make a jump and stop; that horses do not run away if a piece of paper flies in front of them, he might shy a bit, some of them do but not all of them; that horses are like individuals, they have their own pecularities; that he never warned anybody about Black Ace rearing; that if he knew a horse reared he would either not let him out or would have warned people that he did; that the horse was there about six months; that up to that time he let the horse out to people who were experienced riders; that he had ridden Black Ace longer than anybody around the place.

W. E. Butler, testifying on behalf of defendant, stated that he is in the automobile business; that he had ridden Black Ace on the bridle paths and through the woods, the forest preserves; that the horse was a three-gaited horse and had some jumping qualities too; that he was a nice ride; that he had ridden the horse at Mr. Holdorf's suggestion; that he never had any trouble with the horse and that he never reared with him; that he was looking for a horse on the hunter type, but that he was not quite ready to buy but would need one within three months; that he later bought a horse from Mr. Holdorf.

Ruby Holdorf, wife of defendant Elmer Holdorf, testified that she had a conversation with Rosemary O'Donnell, daughter of plaintiff, prior to the time Mr. O'Donnell went on this ride; that plaintiff's daughter said that she and her father were planning to ride

Sunday morning; that she asked Rosemary O'Donnell if her father could ride and that she replied that he had had a lot of experience in the army; that she does not know who actually booked the horses; that she may have had a telephone conversation with some one, but does not remember who called; that after the accident she talked with Miss O'Donnell who had been escorted into the office by one of the other riders who met her at the scene of the accident; that she was quite excited and said her father had been injured; that she, Mrs. Holdorf, asked her what had happened and Miss O'Donnell said the horse had gone up and over on her father; that at that time she, the witness, said, "I thought you told me, Miss O'Donnell, your father could ride." This was later stricken out by the court.

We have set forth the testimony in this case at considerable length for the reason that the claim of plaintiff is based almost entirely on questions of fact. It is alleged that the horse was well known to be a vicious and dangerous animal, stubborn, temperamental, not well trained, gentle or tractable. We have been unable to find any evidence bearing out these allegations. The evidence shows that this horse was purchased by defendant several months before the occurrence in question; that there was no record against him and from the testimony of the various witnesses it was disclosed that the horse had no bad habits so as to make it unsafe for persons to ride. No evidence was introduced showing that this horse had a reputation as a vicious and dangerous animal, which is the main charge set forth in plaintiff's complaint. Plaintiff was a rider of many years experience, a cavalry officer in the army. When he asked if Black Ace was all right to ride, he was told that the horse was all right if he was an experienced rider. He accepted the horse on this condition and the mere fact that the horse reared and showed some spirit and life was not a sufficient reason why the horse should be

termed a "vicious horse." We think the plaintiff relied upon the recommendation and selection of his daughter as being a proper horse for him to ride rather than any representation or warranty by defendant. An experienced rider, such as plaintiff claims he is, should have instantly known how to handle the horse instead of doing as he did, pulling him to the left, causing the horse to become over-balanced which caused the accident. We think pulling the rein, as plaintiff says he did, more nearly accounts for the actions of the horse than any innate viciousness on the part of the horse.

In the opinion of the trial court its decision seems to be based upon the admission which it was claimed Holdorf had made five weeks after the accident. In referring to such conversation the opinion states in part as follows: "As I view the evidence in this case, that fact is determined, binding on the Court as showing—not that the Court is satisfied beyond a reasonable doubt, or that the Court feels it is established by any clear preponderance, but under the rules of law, it has been proved by the weight of the evidence, . . ."

In commenting upon the weight to be given to evidence consisting of oral admissions and confessions, Dean Wigmore on Evidence, 2nd Ed., sec. 2094, at p. 464, states: "In the following passage, the typical warning is well phrased; here, as usually, it is applied specifically to proof of *oral admissions* or *confessions of a party,* because these are the commonest in practice; but the general warning applies to all oral utterances:

"1833, *Earle v. Picken,* 5 C. & P. 542: 'In the course of this circuit, Mr. Justice PARKE several times observed that too great weight ought not to be attached to evidence of what a party has been supposed to have said, as it very frequently happens, not only that the witness has misunderstood what the party has said, but that by unintentionally altering a few of the expres-

458

sions really used, he gives an effect to the statement completely at variance with what the party really did say.'

"1866, REDFIELD, C. J., Note to Greenleaf on Evidence, 12th ed., § 200: 'In a somewhat extended experience of jury trials we have been compelled to the conclusion that the most unreliable of all evidence is that of the oral admissions of the party. And especially where they purport to have been made during the pendency of the action, or after the parties were in a state of controversy. It is not uncommon for different witnesses of the same conversation to give precisely opposite accounts of them; and in some instances it will appear that the witness deposes to the statement of one party as coming from the other; and it is not very uncommon to find a witness of the best intentions repeating the declarations of the party in his own favor as the fullest admissions of the utter falsity of his claims. When we reflect upon the inaccuracy of many witnesses in their original comprehension of a conversation, their extreme liability to mingle subsequent facts and occurrences with the original transactions, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude that there is no substantial reliance upon this class of testimony.' ''

Other points have been urged for our consideration, but as the cause will have to be retried we shall not discuss them at this time.

For the reasons herein given the judgment of the circuit court is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded.*

HEBEL and BURKE, JJ., concur.