RAY EVANS, Appellee, v. HARRY UPMIER, Appellant.

No. 46577.

OCTOBER 17, 1944.

Miller, Huebner & Miller, of Des Moines, and Dutcher, Ries & Dutcher, of Iowa City, for appellant.

Edward L. O'Connor, of Iowa City, for appellee.

MANTZ, C. J.— Plaintiff's action is based upon a claim for damages growing out of injuries received by him on June 3, 1942, while riding a horse belonging to the defendant, at the riding academy of the defendant in Johnson County, Iowa. Plaintiff's petition was in two counts. The first count was based upon an express or implied warranty that the horse hired by the plaintiff for riding purposes was fit, safe, and suitable for such purpose. Count 2 was based upon the negligence of

the defendant in furnishing plaintiff with a riding horse having vicious and unmanageable propensities.

When plaintiff rested he dismissed count 2 and based his entire claim upon count 1. Count 1, in substance, alleged that on June 3, 1942, defendant was operating a riding academy in Johnson County, Iowa, and in so doing furnished to the public riding horses for hire; that on such date plaintiff, along with .others desiring to engage in horseback riding, hired a horse for that purpose; that defendant at that time expressly or impliedly promised and warranted the plaintiff and the public generally that his riding horses were suitable for that purpose and were not vicious, unruly, or unmanageable. Plaintiff further alleged that he hired a horse from the defendant, paid an agreed consideration therefor, and, with others, started on a ride; that while riding his horse became unruly and unmanageable and plaintiff was unable to control him; that thereupon plaintiff started to return to the starting point and while so doing the horse reared and tried to run and when they were close to the fence opening made a sudden turn into and through the opening, dismounting plaintiff and throwing him against a tree, and as a result plaintiff received painful and serious injuries, some of which were permanent.

The defendant by his answer denied the claims of the plaintiff and specifically denied that the horse hired was vicious and unmanageable or had propensities which rendered him unfit for riding purposes and denied any knowledge of such tendencies on the part of such horse, and further alleged that the injury received by plaintiff was one incident to the risk of riding horses.

When plaintiff rested the defendant moved for a directed verdict in his favor, basing such motion largely upon the claim that plaintiff failed to present sufficient evidence to warrant the court in submitting the case to the jury. Such motion was overruled and the cause was submitted to the jury, resulting in a verdict for the plaintiff, whereupon defendant filed a motion for a new trial and for judgment notwithstanding the verdict, and upon the same being overruled appealed to this court.

I. No question was raised as to the nature or extent of ap-

pellee's injuries or that the verdict was excessive or the result of passion and prejudice.

II. Appellant urged on appeal three grounds wherein he claims the court committed error and that because of these errors appellant is entitled to a reversal.

The errors claimed and argued on this appeal by appellant are as follows:

1. Overruling motions for directed verdict based on insufficiency of the evidence.

2. Overruling objections to questions calling for the opinion of four witnesses as to whether or not the horse Romeo was vicious, unsafe, and unsuitable for riding purposes.

3. Submitting to the jury Instructions Nos. 5, 6, 7, and 8, presenting the issue of breach of implied warranty.

We will consider these matters in the order above stated.

III. The first question presented is whether the court erred in overruling appellant's motion to direct a verdict in his favor and in submitting to the jury the issues raised in the petition of appellee.

In passing upon the motion to direct a verdict against him, appellee, under the familiar rule, was entitled to have the evidence considered in its most favorable light in his behalf.

We do not think that the court erred in submitting the case to the jury. We think that there was ample evidence in the record to generate a jury question. We call attention to a few of the facts appearing in the record which we think sustain our holding. Appellee was a man forty-two years of age and had not ridden a horse for over twenty years. The record does show that when a youth he did some riding, the extent thereof not appearing. He worked on a newspaper in Iowa City and there is nothing in the record to indicate he had any experience in riding horses following his youth. On the date in question, along with a group, he went to appellant's riding academy and had a horse assigned to him. This horse went under the name of Romeo. The record shows that Romeo was purchased by the appellant in Cedar Rapids in March 1942, and was sold in October 1942. As witnesses, neither the appellant nor his son could remember the name of the man from whom Romeo had been purchased, nor the name of the man to whom

he was later sold. The record shows that the horse was un-broken to work or ride when purchased. Various witnesses among the group testified to the actions and demeanor of the horse Romeo while being ridden on the trip. There is evidence that he was high-spirited and inclined to run and when sought to be restrained would rear. Appellee testified that on the trip Romeo wanted to run; was hard to control; that he reared on his hind legs when the rider tried to hold him back; that on the trip he exhibited what are known as "outlaw" traits in wanting to be at the lead; that as they started home Romeo ran on a gallop in spite of appellee's efforts to hold him back; that appellant, riding in the group, told appellee, "just leave the horse have his head"; that when the reins were loosed temporarily Romeo would start to run and when the reins were pulled up he would rear on his hind legs. Appellee testified that as they were approaching the opening in the fence he was riding a few feet from a horse ridden by Mr. Urban; that at this point Romeo was running and then suddenly and swiftly swerved to the right, bumping into the Urban horse and causing that horse to strike appellee's right shoulder, throwing appellee off and against a tree that was at the edge of the gate. Following this, Romeo bolted for the starting point.

The force of the impact threw Urban from his mount and he was dragged for some distance with one foot in the stirrup. There were other witnesses whose testimony corroborated the statements of appellee. Some of these witnesses were riding closely behind appellee just before the accident. The appellant introduced considerable testimony to show that Romeo was a gentle horse and could be ridden by almost any person. Phyllis Langer, testifying for appellant, said that Romeo was full of life. Kathryn Neuzil, for appellant, testified that she had as-sisted at the riding academy during the summer of 1942; that she helped assign the horses to the various riders; that she never rode Romeo but that girls and men had ridden him. The follow-ing statement by her as a witness is rather significant:

"Romeo was one of the horses that I usually assigned to anyone of the group that had done some riding. We didn't have excellent horsemen in our group, none of them were ex-

cellent horsemen. Some of them were beginners, and I would hesitate to assign Romeo to a purely beginner rider, but Romeo was assigned to anyone who had done any amount of riding at all.''

Later, on cross-examination, she stated:

''I wouldn't assign Romeo to a beginner.''

We think the evidence was such that it created a conflict, and thus it became the duty of the court to submit the case to the jury and we hold that the court did not err in so doing.

As before stated, it was the substance of the claim of appellee that an implied warranty of the horse ridden by him arose in this case. That is denied by the appellant, who also claims that, even if an implied warranty arose, there was not sufficient evidence to show that appellant had notice or knowledge of the unsuitability of the horse for riding purposes and that appellee had failed to make sufficient showing and consequently could not recover.

Both parties have cited authorities from various jurisdictions. No Iowa case dealing with such a situation has been cited and it has been stated by one of the parties that this court has not passed upon a case of this kind.

An examination of the cases indicates that the general rule is that in cases of the hiring of horses for riding purposes, in the absence of special contract or patent defects, owners impliedly warrant that the horses are suitable for the purposes known to be intended. It has been stated that the rule is well settled that in an ordinary contract, where one lets a horse for hire, such owner is under an obligation, sometimes referred to as implied warranty, to furnish a reasonably safe animal for the purpose known to be intended, and for a failure to use due care to discover dangerous propensities in such animal, or to disclose them to his hirer, he may be held liable. Annotations 12 A. L. R. 778, 131 A. L. R. 847; Smith v. Pabst, 1938, 233 Wis. 489, 288 N. W. 780; Foley v. O'Flynn, 288 Mass. 504, 193 N. E. 44; Cooper v. Layson Bros., 14 Ga. App. 134, 80 S. E. 666; Artificial Ice & Cold Storage Co. v. Martin, 102 Ind. App. 74, 198 N. E. 446; Conn v. Hunsberger, 224 Pa. 154, 73 A. 324,

25 L. R. A., N. S., 372, 132 Am. St. Rep. 770, 16 Ann. Cas. 504; 24 Am. Jur. 498, section 38. In the case of Vaningan v. Mueller, 208 Wis. 527, 243 N. W. 419, the Wisconsin court held that a liveryman furnishing a horse for hire impliedly warrants that the horse is fit for the purpose for which it is let. That case cites cases from other jurisdictions, treating the trial of such actions as being founded upon contract and stating the warranty or contract obligation of the liveryman to be that a horse is free from defects so far as he knows or that could be discovered with reasonable care. Supporting such rule, the Wisconsin court cites Horne v. Meakin, 115 Mass. 326; Conn v. Hunsberger, supra; Copeland v. Draper, 157 Mass. 558, 32 N. E. 944, 19 L. R. A. 283, 34 Am. St. Rep. 314; Troop A Riding Academy v. Steverding, 39 Ohio App. 560, 177 N. E. 601. The Wisconsin case above cited refers to the Conn v. Hunsberger case as containing a very full and complete discussion of the contract and duties of one letting horses for hire. In the Conn case plaintiff hired from defendant a horse to be used for a certain designated purpose. Hirer was not familiar with the horse hired. While on the trip the horse, apparently without cause, started to run and kick, during which time plaintiff was seriously injured. Suit was brought for damages on an implied warranty. At the conclusion of the trial in the lower court a verdict was directed in favor of the defendant on the ground that there was "no evidence that defendant knew or by the exercise of reasonable care could have known that the mare was unsuitable for use, if in fact she was so." On appeal the lower court was reversed, the higher court holding that the relationship between the parties was that of bailor and bailee for hire and that the bailor assumed the liability which the contract of bailment imposes; that, while a bailor lets a horse for hire, he impliedly promises or warrants that the animal is fit and suitable for the purpose for which it is hired; that he warrants that the horse is not unruly or vicious, but is safe, manageable, and suitable for the use for which the customer has hired him. The Conn case is a leading case upon this subject and bears evidence of having been carefully considered, making a careful analysis of the cases and the reason for the rule. We desire to quote briefly from the holding of the court, 224 Pa. 154, 158, 73 A. 324, 325, 25 L. R. A.,

N. S., 372, 374, 132 Am. St. Rep. 770, 16 Ann. Cas: 504, as follows:

"It is the duty of a livery-stable keeper to inform himself of the habits and disposition of the horses which he keeps in his stable for hire, and if he knows that they are dangerous and unsuitable or by the exercise of reasonable care could ascertain the fact he is liable for any injuries to his customers resulting from their vicious propensities. The law will not permit him to close his eyes and his ears, thereby remaining ignorant of the vicious habits of his horses, and relieve him from liability for injuries to a customer resulting from such habits. * * * His warranty is against defects or vicious habits which he knows or by the exercise of proper care could know, and if he fails to exercise such care and it occasions injury to his customer, he will not be relieved of liability though he did not actually know the horse was unsuitable for the service."

In the case of Lynch v. Richardson, 163 Mass. 160, 162, 39 N. E. 801, 47 Am. St. Rep. 444, the court, in dealing with this same question said:

"It was the duty of the defendant to furnish a horse that had no such vicious habit, and if he knew of the existence of the habit, or if, by the exercise of reasonable care to ascertain whether the horse was suitable for the use of hirers, he ought to have known that it was dangerous, he is liable for such injuries as resulted from his wrongful conduct. * * * It was the duty of the defendant to try to inform himself in regard to the habits of horses kept in his stable for use in his business. It does not require a very long acquaintance with a horse to enable an ordinary livery stable keeper to form a correct opinion of its qualities. Usually he tries to ascertain as much as possible about it before becoming its owner."

Many other cases might be cited, but we think the above and those cited therein sustain the rule claimed by appellee herein.

Appellant cites a number of cases which he claims sustain his contention that the evidence in the present case was in-

sufficient to justify the jury in finding that the proximate cause of injury to plaintiff was a breach of implied warranty or contract. We have examined the cases cited and find ourselves unable to agree with appellant's contentions. Most of the cases cited turn upon factual situations therein existing.

Appellant has cited and places considerable reliance upon various holdings of the Ohio supreme court. Some of these cases will be referred to and briefly discussed later in this opinion. A study of the Ohio cases indicates that there is not complete harmony among them; also that such holdings are not in line with the great weight of authority as to the liability of one who hires horses to the public generally. The rules laid down by that court in cases where riders are injured by reason of the unsuitability of the animal hired announce a rather strict doctrine and one hardly supported in reason or logic. In that court the ''implied warranty'' doctrine has been narrowed and limited in its application. In an annotation appearing in 131 A. L. R. 848, the annotator makes the following comment:

''In several Ohio decisions the courts, although purportedly approving the rule that a bailor for hire of a horse is bound to exercise due care in the selection of a horse, indicated that in order for the bailee to recover from the bailor for personal injuries it must be shown that the bailor had knowledge of a trait or propensity of the horse which might lead to the injury complained of.''

We find few authorities supporting the rule of the Ohio cases, the majority holding to the contrary.

We think that it would be more in line with logic, reason, and justice to apply in the present case the rule as laid down in the Conn case rather than to apply the narrow and strict construction of the Ohio cases.

The operation of a riding academy is a sort of specialized business. It is a matter of common knowledge that in such business there are present various hazards, not the least of which is the riding of horses by inexperienced riders. Many who seek to hire horses come utter and total strangers to the animals to be ridden, knowing nothing about the characteristics and propensities of such animals, and with little or no oppor-

tunity to become acquainted with such. In speaking of the situation of the owner of the horse and the one hiring, the court, in the Conn case, said at page 158 of 224 Pa., page 325 of 73 A.:

"The customer is at his mercy and must rely upon the liveryman to guard him against the danger of a vicious animal or defective vehicle; and hence he has the right to demand of the liveryman that he will use such care in supplying a horse or carriage as a reasonably prudent man exercises in the conduct of his own business affairs. While this court has not passed upon the question, the doctrine here announced is recognized and applied in other jurisdictions." Citing, 25 Cyc. 1513; 19 Am. & Eng. Encyc. of Law, 2d Ed., 432; Edwards on Bailments, section 373; Fowler v. Lock, L. R. 7 C. P. 272; Horne v. Meakin, 115 Mass. 326; Lynch v. Richardson, 163 Mass. 160, 39 N. E. 801, 47 Am. St. Rep. 444; Windle v. Jordan, 75 Maine 149; Stanley v. Steele, 77 Conn. 688, 60 A. 640, 69 L. R. A. 561, 2 Ann. Cas. 342; Nisbet v. Wells, 76 S. W. 120, 25 Ky. L. R. 511.

We fail to see wherein it works a hardship upon the owner of a riding academy to hold him to accountability for damages arising by reason of the unsuitability of horses rented to customers who know next to nothing of the horse being hired. It seems to us that the question as to whether the owner knew, or in the exercise of due care should have known, the habits and propensities of a horse being rented is a proper one for the jury if there exist any facts and circumstances indicating that the owner did have or could have had such knowledge. When the owner of a riding academy buys a horse to be hired to the public, common care and prudence require that the purchaser inform himself as to the disposition and propensities of the purchased animal. Using the purchased animal for riding purposes over a period of some months would give ample opportunity to know the animal, his disposition and propensities.

Appellant has cited various cases which he argues are authority for his claim that there is no liability in the present case due to insufficiency of evidence and failure to show that what happened was the proximate cause of the injury. We will briefly consider some of the cases cited by him.

In what was termed ''Vigilant'' case, in Smith v. Pabst, 233 Wis. 489, 288 N. W. 780, a minor was injured while riding a horse in the woods; an attendant was with her at the time. The branches on some of the trees were low and while riding the girl noticed they were approaching two trees rather close together. She tried to steer the horse to one side and thereupon the gait of the horse was accelerated, the extent of which did not appear. She says that she then closed her eyes and waited. She either fell or was brushed off by the trees. There is no evidence that the horse was vicious, unruly, or unmanageable. There is no evidence that the horse reared, ran, jumped, or bolted while being ridden. The fastest speed was shown to be a trot, and after the girl fell from the horse, the horse went but a few paces and stopped. A verdict for the defendant on appeal was affirmed. This case was tried upon the theory of an express and implied contract and tort. The court held that the rule applied that the hirer of a horse should exercise ordinary care and caution in the selection of horses so that the riders would not be injured. This case seemed to turn upon the facts. The court held that there was nothing to indicate that the horse was vicious or unmanageable or that the owner had any knowledge or notice of that propensity.

In the case of O'Donnell v. Holdorf, 304 Ill. App. 442, 446, 26 N. E. 2d 653, 655, the plaintiff was an experienced rider. He had been a member of a cavalry troop and had seen active service on the border, his service in said troop being from 1909 until 1916, and following that he rode on many occasions. When he asked for the horse ''Black Ace'' he inquired if it (the horse) was all right and the answer was, ''Yes, if you are an experienced rider.'' He replied that he was. The lower court found in favor of the plaintiff. Upon appeal this action was reversed, the court holding the evidence was insufficient to show that the horse ridden was known to be a vicious and dangerous animal. The case turns almost entirely upon the fact situation. Few authorities are cited in this case.

In the case of Dam v. Lake Aliso Riding School, Cal. App., 48 P. 2d 98; id., 6 Cal. 2d 395, 57 P. 2d 1315, there were personal injuries suffered by a minor in riding a hired horse. A claim was based upon implied warranty that the horse hired was

fit for riding purposes but the claim was that the horse was vicious and unsafe. The record shows that the injured person had been attending the riding academy for thirteen months and had had prior riding experience of from six to seven years while riding horses on a ranch; that she was classified as a good rider. The case was submitted to the jury with a special interrogatory as to whether the horse was really vicious, dangerous, or unsuitable for riding purposes. The jury returned a verdict and answered the interrogatory in the negative. The higher court held that under the factual situation the answer of the jury was controlling and settled the issues involved.

In the case of Troop A Riding Academy v. Steverding, 39 Ohio App. 560, 177 N. E. 601, an action was brought upon both the express and implied warranty that the horse hired was fit, safe, and suitable for riding purposes. The party injured had ridden the horse the day before and asked for it on the day injured. The evidence shows that the horse started at a rapid speed and uneven gait and got out of control and could not be checked; that the rider was thrown from the horse and was injured. The higher court held that one who lets animals for hire must exercise ordinary care and diligence in providing an animal suitable for that purpose. It held that the evidence did not sustain the charge of the injured person that the horse was of that character and thus the case turned on the fact situation.

In the case of Troop A Riding Academy v. Miller, 127 Ohio St. 545, 189 N. E. 647, a suit was brought in tort to recover damages suffered by the rider of a hired horse. In the lower court judgment was rendered in favor of the rider. This was reversed upon appeal on the ground that the evidence was insufficient to warrant a submission. The evidence showed that the rider had patronized Troop A Riding Academy fifteen or twenty times; that she had frequently patronized other riding stables in Cleveland and had ridden in the West on a ranch; that she had ridden horses since her childhood and was not wholly inexperienced in riding; that she showed familiarity with riding equipment and the technique of riding. The case supports the ruling that the hirer of a horse must exercise ordinary care and diligence in providing an animal suitable for riding purposes.

We do not think that the cases cited by appellant and above referred to have application to the factual situation existing in this case.

The appellant argues that even if there existed an implied contract that the horse hired by appellee was fit and suitable for riding purposes, yet the record fails to establish the claim that the horse was possessed of and did exercise such unsuitable propensities; and further, the record does not have anything to show that appellant had notice and knowledge of such propensities, and that whatever did happen could not possibly have been foreseen.

We think that the evidence as above set forth, considered in the most favorable light on behalf of the appellee, made a jury question on the issue of the safety and suitability of the horse for riding purposes.

As to the issue of the knowledge or notice of the claimed unruly and unsuitable propensities of the horse, we think that the case is governed by the rule laid down in the Conn case and later cited with approval in many other cases, and that it is sufficient to warrant the holding in this case that it was the duty of the one hiring the horse to inform himself of its propensities, and that a failure upon his part to do so will not allow such owner to escape liability where a rider is injured as a result of such propensities.

Aside from the rule as above set forth in the Conn case, we think that there were in the record sufficient facts and circumstances to warrant the court in submitting to the jury under proper instructions the question of the knowledge or notice of the appellant as to the claimed unruly and unsuitable propensities of the horse hired by appellee.

IV. The second error urged by appellant deals with the refusal of the court to sustain objections to questions calling for the opinions of four witnesses as to whether the horse Romeo was vicious, unsafe, and unsuitable for riding purposes.

Appellant argues the point raised but does not cite any authority in support thereof and confines himself to a discussion of the facts.

The witnesses to whom the questions were propounded were all members of the riding group. They gave testimony as to

what they observed and what the horse Romeo did during the ride, his actions on that occasion indicating that he was unruly, hard to control, with a tendency to run and to rear when sought to be restrained. Following this they were asked to give an opinion as to whether or not Romeo was high-spirited, was hard to control, or whether he exhibited a propensity to be unruly, vicious, or unmanageable. In effect, these witnesses described to the jury what they saw the horse do on that occasion. Such were statements of fact learned from observation. We think it is proper for a witness to testify to observations made by him, to describe things as they appeared to him; and this is especially true when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time.

In the case of Yahn v. City of Ottumwa, 60 Iowa 429, 432, 15 N. W. 257, 258, there was involved the matter of the testimony of witnesses regarding opinions and conclusions formed from observations made. In that case a team of horses was frightened and this court held that a witness basing his opinion upon observation could give an opinion as to what frightened them. In its opinion the court said:

"But it surely is competent for a witness to state whether the horses were frightened by a stream of water thrown upon or around them, or by the escape of steam from an engine, or by being set upon by a dog, or the like. The observation of the witness as to cause and effect is a fact which he may state to the jury. Upon a question like this, the discharge of the water from the hose and its effect upon the horses appears to us to be a compound of fact and opinion. To hold that it is incompetent would limit and hamper the introduction of evidence in a manner not contemplated by any rule of law of which we have any knowledge. If it be the law that a witness, not an expert, may not under any circumstances give an opinion, the statement of these witnesses that the horses were frightened would not be admissible. But the rule is not thus to be applied. It is competent for a witness to testify to his conclusion, when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness

at the time. It appears to us that the subject-matter—the alleged fright of the horses in this case—was of the character just described. A witness may see a team frightened, and may state the fact that water was thrown from a hose upon or near the team, and he may describe how and when it was thrown, and yet he cannot put the jury in his place in regard to the facts, without stating his conclusion as to the effect of the throwing of the water."

A witness might state his opinion in regard to sounds, their character, from what they proceed and the direction from which they seem to come. State v. Shinborn, 46 N. H. 497, 88 Am. Dec. 224. It is competent for a witness, not an expert, to testify as to the condition of health of a person and that he is ill or disabled or has a fever or is destitute. Barker v. Coleman, 35 Ala. 221. A witness may give his judgment as to whether a person was intoxicated at a given time. State v. Huxford, 47 Iowa 16.

The objections to the offered testimony were based in part on the claim that the witnesses were incompetent and their answers were conclusions. As a general rule a witness may not state conclusions, but where it is necessary to a clear understanding of the facts he may do so. Hoadley v. Hammond, 63 Iowa 599, 19 N. W. 794; annotation L. R. A. 1918A, 681.

In the case of Kuen v. Upmier, 98 Iowa 393, 399, 67 N. W. 374, 375, there was involved in the inquiry the ability of a certain person to speak the English language. The witness, after stating some facts, was asked, "What was her ability to speak English?" The witness answered, "She spoke in broken English, so that she could be understood." The witness was asked, "When you would talk with her in English, did she appear to understand what you said?" The lower court excluded both answers and others along the same lines. This court held this exclusion to be error. In so doing, the court said:

"It is certainly proper for a witness to state whether a person talks so as to be understood in a language the witness understands. It is, of course, a conclusion, but all statements are, more or less, conclusions. It was, at the same time, a fact, of

which the jury could be told, as evidence from which to form its conclusions. It was not a conclusion to be drawn from the evidence, so that the jury as well as the witness would draw it."

In the matter of the admissibility of opinion evidence, see Vannest v. Murphy, 135 Iowa 123, 112 N. W. 236; Bizer v. Bizer, 110 Iowa 248, 81 N. W. 465; Stewart v. Anderson, 111 Iowa 329, 82 N. W. 770; Kelleher v. City of Keokuk, 60 Iowa 473, 15 N. W. 280; 1 Greenleaf on Evidence [Appendix II], section 440; 20 Am. Jur. 670, section 798.

In overruling the objections of appellant to the testimony of the witnesses and admitting the same, we hold that the court did not err.

█ VI. The last point urged by appellant is that the court erred in submitting to the jury Instructions Nos. 5, 6, 7, and 8, presenting the issue of breach of warranty.

Before these instructions were given exceptions were taken thereto by appellant. It seems to us that the exceptions taken were quite general in form. We are somewhat in doubt as to whether the exceptions taken comply with Rule 196, Iowa Rules of Civil Procedure.

It is to be kept in mind that appellee's action is based upon the claim that appellant breached his implied agreement of warranty. The count based upon negligence was dismissed by appellee when he rested.

In the statement of the issues to the jury, the court gave paragraph 3, as follows:

"That defendant impliedly warranted that said gray horse was suitable for riding purposes and that he was not vicious and unmanageable and that he did not have any vicious or mischievous propensity of becoming unmanageable when ridden."

No exception was taken to this paragraph.

An examination of the Instructions Nos. 5, 6, 7, and 8 reveals that all of these instructions were based upon the issue as above set forth in paragraph 3.

Appellant's principal complaint, as we understand it, is that the court in its instructions should have confined the jury, in passing upon the suitability of Romeo as a safe animal to

ride, to the specific instance of passing through the gate when appellee was thrown against the tree. He argues that the consideration of the jury should have been limited to that one incident.

In passing upon the suitability of Romeo for riding purposes, it seems to us that the jury would have a right to consider all of the testimony of what happened that day, whether before, at the time of, or following the injury of appellee.

Instruction No. 5 instructed the jury as to the duties imposed upon the keeper of a riding academy to inform himself of the habits and dispositions of horses kept for hire, and his obligations in connection therewith. Said instruction further told the jury that the hirer is not an insurer of suitability of a horse let to a customer, but that he is bound to exercise the care of a reasonably prudent man to furnish a horse that is fit and suitable for the purpose contemplated in hiring.

Instruction No. 6 sets forth the law as applied to the implied promise or warranty that a horse was fit and suitable for riding purposes.

Instruction No. 7 is as follows:

"If you find that the gray horse hired to plaintiff was vicious or unsafe or unsuitable for the purpose for which plaintiff hired it, plaintiff would still not be entitled to recover unless you find that the breach, if any, of the implied warranty or contract by defendant to furnish a horse that was safe and suitable for the purpose for which it was hired, was the proximate cause of the injuries and damages that plaintiff may have sustained."

Instruction No. 8 is as follows:

"Now, in this case if you find by a preponderance of the evidence, First: That the gray horse hired to plaintiff by defendant was vicious or was unsuitable or unsafe for the purpose for which it was hired, and, Second: You also find by a preponderance of the evidence that defendant knew, or in the exercise of reasonable care should have known of such habits or propensities, and that plaintiff's injuries and damages, if any, were occasioned thereby, and Third: You also find by a pre-

ponderance of the evidence that the breach, if any, of the implied warranty or contract by defendant to furnish a horse that was safe and suitable for the purpose for which it was hired was the proximate cause of such injuries and damages, then defendant would be liable for such damages, if any, and your verdict will be for the plaintiff. If you do not so find you will find for the defendant.

"The burden of proof is upon the plaintiff to establish by a preponderance of the evidence each of the three propositions above set forth and if he has not done so he cannot recover."

We think that the instructions given, when considered in the light of the issue presented, fairly and correctly set forth to the jury the law applicable to the fact situation and that said court in giving said instructions did not commit error. We hold that there is no error in the record sufficient to warrant a reversal.—Affirmed.

HALE, WENNERSTRUM, SMITH, MULRONEY, OLIVER, BLISS, and GARFIELD, JJ., concur.

MILLER, J., takes no part.