[No. 4697–1.  Division One.  August 28, 1978.]

BARBARA D. HOJEM, *Appellant,* v. JOHN KELLY,
ET AL, *Respondents.*

*Oberquell & Ahlf* and *Argal D. Oberquell,* for appellant.

*Brothers & Coyne* and *Curtis J. Coyne,* for respondents.

ANDERSEN, A.C.J.—

### FACTS OF CASE

This is a personal injury action brought by the plaintiff against the proprietors of a riding stable which rented her the horse she was riding at the time she fell and was injured. The jury returned a $20,000 verdict for the plaintiff and reduced it by 50 percent for her contributory negligence. The trial court granted the defendants' motion for judgment notwithstanding the verdict and the plaintiff appeals.

At the time of her fall, the plaintiff had been riding at the defendants' stables for 16 or 17 months, occasionally as often as twice a week and sometimes once a month.

On her initial visit to the stables, the plaintiff was accompanied by one of the defendants' employees over some of the trails on the ranch, and a field in which she could ride was made available. One of the defendants also taught her how to mount and dismount. She regularly rode for pleasure at the defendants' ranch using a western style saddle, starting with the most gentle horse available and then moving on to more spirited horses. She rode all over

the ranch,. sometimes in fields where there were riderless horses. At all times, signs were posted on the premises reading, "Ride and visit at your own risk."

Following some 11 months or so of pleasure riding, the plaintiff began formal lessons in English–style riding using English tack. It was after 6 months of English riding lessons, including lessons on how to mount, dismount and stop a horse, that the injury occurred.

On the day of the injury, the plaintiff and a friend went to the riding stables where they rented horses. They then rode to a field of their own choosing and practiced riding. After 45 minutes, a riderless horse somehow entered the field. That horse, a gelding, was being boarded at the defendants' ranch. The riderless horse ran up to the horse being ridden by the plaintiff and frightened it into a gallop, then ran along side of it or behind it. The plaintiff lost control of the horse she was riding, and the horse broke stride. She then lost her hold, fell and was injured.

One issue is determinative.

## ISSUE

Did the trial court err in granting the defendants' motion for judgment notwithstanding the verdict in this negligence action?

## DECISION

CONCLUSION. The trial court did not err in granting the judgment n.o.v. (judgment non obstante veredicto). As a matter of law, the plaintiff did not present substantial evidence, as distinguished from a mere scintilla, that the defendants breached any duty owed to her.

■ The law is settled as to situations in which judgment n.o.v.'s may be granted:

> Such a motion involves no element of discretion and will not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. In ruling on a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most

favorable to the party against whom the motion is made, and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. If there is substantial evidence supporting the verdict of the jury, as distinguished from a mere scintilla of evidence, the verdict must stand. By "substantial evidence" is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.

*Grange v. Finlay,* 58 Wn.2d 528, 529, 364 P.2d 234 (1961). *Accord, Pacific Nat'l Bank v. Morrissey,* 17 Wn. App. 525, 527, 564 P.2d 337 (1977).

■ The plaintiff's case was pleaded, tried and decided on a negligence theory. The jury was instructed that the plaintiff had the burden of proving that the defendants were negligent. No exception was taken to the instructions given. In order to recover damages due to the negligence of another, a party must prove the existence of a duty by the other to him or her, breach of that duty, causation and damages. *LaPlante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975); *Georges v. Tudor,* 16 Wn. App. 407, 409, 556 P.2d 564 (1976).

At the close of the plaintiff's case, the defendants challenged the sufficiency of the plaintiff's evidence. The trial court stated at that time:

Well, I have heard a lot of these cases where—well, this type of case. . . .

This is about the thinnest case that I have ever run into as far as liability on the defense is concerned, because there has been absolutely—at least there doesn't appear to me to be—any real showing of negligence.

The trial court did, however, deny the defendants' challenge at that time and the defendants then presented their case.

When both sides had rested, the defendants renewed their challenge. The trial court then ruled:

I agree with you. I think the case should be dismissed right here and now. But I am going to let the jury have it anyway, and if they should award her anything, then I will take it away from the plaintiff and then let an

Appellate Court decide, because that would save the county money because they wouldn't have to go through the four days that we have gone through already in trial. But, in my humble opinion, the plaintiff has failed to prove by a preponderance, any negligence on behalf of the defendant. It is that simple.

Following the verdict for the plaintiff, a judgment n.o.v. was granted. In connection therewith, the trial court stated:

There is no question about the fact that she was injured. But, under the case, it would mean absolute liability; if this verdict were sustained it would mean that any riding stable is absolutely liable for any injury occurring while somebody is renting a horse on the place.

And further,

So I just feel the plaintiff, in my humble opinion, certainly didn't prove this. And there was no expert opinion by anybody that it was dangerous to allow another horse, a riderless horse, into a pasture where people were riding horses—none.

Pivotal to our decision in this case is what the defendants' duty to the plaintiff was and whether or not it was breached.

The horse plaintiff was riding at the time she was injured was owned by the defendants who rented it to her. Owners or bailors of a horse known to be vicious, dangerous or unmanageable are negligent in hiring it out and thus endangering the bailee, and will be held liable for injuries proximately caused thereby. *O'Brien v. Gateway Stables,* 104 Cal. App. 2d 317, 231 P.2d 524, 526 (1951); *Evans v. Upmier,* 235 Iowa 35, 16 N.W.2d 6, 9 (1944); 4 Am. Jur. 2d *Animals* § 68 (1962); 15 A.L.R.2d 1313, 1316 (1951). In the present case, however, the plaintiff conceded in her testimony, as did her counsel in argument to the trial court, that the horse she was riding was not vicious, dangerous or unmanageable. Thus no liability was established on that basis.

As the boarders of the riderless horse which found its way into the pasture where the plaintiff was riding, the defendants could also be held liable to the plaintiff if it was

established that the gelding was vicious or dangerous and that such was known or reasonably should have been known to the defendants. *Reeves v. John A. Cooper Co.,* 304 F. Supp. 828, 833 (W.D. Ark. 1969); *Hagerty v. Radle,* 228 Minn. 487, 37 N.W.2d 819, 828 (1949); 4 Am. Jur. 2d *Animals* § 101.5 (Cum. Supp. 1977); 85 A.L.R.2d 1161, 1163 (1962). No such showing was made as to that either. *See Harris v. Carstens Packing Co.,* 43 Wash. 647, 651, 86 P. 1125 (1906); *Gunderson v. Bieren,* 80 Wash. 459, 462, 142 P. 685 (1914).

Here there was testimony that riderless horses were not usually present in the riding areas, and when they were, they would sometimes be shooed away because they could be a bother. Even assuming that the defendants were responsible for the riderless horse being in the pasture where the plaintiff was riding, as we do for the purpose of testing the judgment n.o.v., there was still no substantial evidence, expert or otherwise, that a riderless horse in a riding practice area is dangerous or violates any customary standards of care of riding stables.

█ Central to all aspects of this case is the principle that a domesticated animal such as a horse will not be presumed to be vicious or dangerous. *Moessinger v. Johnson,* 292 So. 2d 606, 607 (Fla. Dist. Ct. App. 1974); *Vigue v. Noyes,* 24 Ariz. App. 144, 536 P.2d 713, 715 (1975), *modified on other grounds,* 113 Ariz. 237, 550 P.2d 234 (1976).

Absent some showing that the horses involved were vicious, dangerous or unmanageable, the defendants had no duty to warn of them. *Dam v. Lake Aliso Riding School,* 48 P.2d 98, 101 (Cal. Dist. Ct. App. 1935), *aff'd,* 6 Cal. 2d 395, 57 P.2d 1315 (1936); 4 Am. Jur. 2d *Animals* § 68 (1962); 15 A.L.R.2d 1313, 1319 (1951).

No contention has been made that the equipment on the horse being ridden by the plaintiff was faulty in any way.

The plaintiff also argues that "[t]he land owner has a duty to provide and maintain safe riding stables [*sic*] premises." She cites in support thereof Restatement (Sec-

ond) of Torts § 342 (1965);[1] *Memel v. Reimer,* 85 Wn.2d 685, 538 P.2d 517 (1975) and *Miniken v. Carr,* 71 Wn.2d 325, 428 P.2d 716 (1967). It is true that Restatement (Second) of Torts § 342 (1965) is the law of this state, having been adopted in *Miniken* and *Memel.* This section of the Restatement is entitled "Dangerous Conditions Known to Possessor," Restatement (Second) of Torts § 342 (1965), and relates only to a landowner's "duty to exercise reasonable care where there is a known dangerous condition on the property . . ." *Memel v. Reimer, supra* at 689. There was no breach of any duty based on these principles since, as discussed above, the plaintiff failed to present substantial evidence showing the existence of a known dangerous condition.

The plaintiff also urges that the doctrine of res ipsa loquitur should be held to apply. We disagree. The horse which the plaintiff was riding was frightened by another horse and galloped off, and the plaintiff lost control of the horse and fell. There is no question as to the actual cause of the injury; therefore, res ipsa loquitur does not apply. *Chase v. Beard,* 55 Wn.2d 58, 68, 346 P.2d 315 (1959).

To then summarize.

The plaintiff fell off the rented horse she was riding and was injured. She was at least a moderately experienced horseback rider at the time and chose the pasture in which she and her friend were riding when the injury occurred. The plaintiff had been riding regularly for 16 or 17 months, had taken riding lessons and was familiar with the riding premises.

There is no claim that the riding horse she rented from the defendants was not entirely suitable for that purpose or that the tack on the horse was unfit. Neither was there any showing that the other horses in the pasture where she was riding were vicious, unmanageable or dangerous in any way.

---

[1]Since this is the only standard of care on the part of the respondents as landowners that the appellant has argued on appeal, it is the only one which we address in this opinion. *Gunnar v. Brice,* 17 Wn. App. 819, 822, 565 P.2d 1212 (1977).

No expert witness' testimony was presented by the plaintiff that the defendant stable owners owed her any duty with respect to riding instructions, keeping the horses separated, etc., which was breached.

No breach of warranty or of contract is claimed and the plaintiff's case was submitted on a negligence theory entirely. The most that can be said of the plaintiff's proof in that regard is that she proved horses are animals, all of which will occasionally play, kick or nip. We are not prepared to rule that it is or should be the law in a partly rural western state such as ours, that anyone who loans or rents a riding horse to another is the insurer that the rider will not be injured—or the guarantor that the horse will always remain insulated from others of its kind while it is being ridden on their premises.

The trial court did not err in granting the judgment n.o.v. in that the plaintiff presented no substantial evidence showing that the defendants breached any duty which they owed to the plaintiff.

The plaintiff having as a matter of law failed to prove negligence, the remaining assignments of error which relate to instructions refused and mistrial motions denied are moot.

Affirmed.

CALLOW, J., concurs.

DORE, J. (dissenting)—Plaintiff alleged that defendants, owners of a commercial riding stable, failed to provide safe premises to the plaintiff, a business invitee, as a result of which she was injured. The jury awarded plaintiff a $20,000 verdict but found plaintiff 50 percent guilty of contributory negligence and reduced its verdict proportionately. The trial court later granted defendants' post–trial motion for a judgment n.o.v. The only issue on appeal is whether there was sufficient evidence of defendants' negligence to support the verdict.

In passing upon a motion for judgment n.o.v. or a new trial, the evidence, and all reasonable inferences therefrom, must be viewed in a light most favorable to the nonmoving party, and if there is substantial evidence supporting the jury verdict, the verdict must stand. *Haft v. Northern Pac. Ry.*, 64 Wn.2d 957, 395 P.2d 482 (1964).

The majority opinion adequately describes the facts as to how the accident happened so I will not repeat them other than to stress that plaintiff was a paid patron of the riding academy and that the riderless horse "Midnight" which caused the accident, was kept in an adjacent barn and field area where it was being boarded by its owner with defendants.

Defendants owed plaintiff a duty to provide safe riding stables and to warn of any known dangerous condition on the premises. Restatement (Second) of Torts § 342 (1965); *Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975); and *Miniken v. Carr*, 71 Wn.2d 325, 428 P.2d 716 (1967). Contrary to the majority's opinion, plaintiff's remedy is not exclusively predicated upon plaintiff's proof of defendants' knowledge of the viciousness or vicious propensities of the rented and/or boarded horse.[2]

It is sufficient, in holding the defendants liable, if plaintiff proves that defendants knew or by the exercise of reasonable care should have known of the inclination or propensity of the riderless horse to do the particular mischief that was the cause of the harm. *Herbert v. Ziegler*, 216 Md. 212, 139 A.2d 699 (1958). *See Palmquist v. Mercer*, 43 Cal. 2d 92, 272 P.2d 26 (1954), holding that a stablekeeper has a duty to inform himself of the habits and disposition of horses which he keeps in his stable for hire.

The testimony at trial indicated the following:

---

[2]*See Dam v. Lake Aliso Riding School*, 48 P.2d 98 (Cal. Dist. Ct. App. 1935), where the court stated at page 100: "Knowledge of the viciousness of an animal is essential except when the animal is hired, and in such an instance when the bailee seeks to recover for injuries the plaintiff's case is complete if injuries are shown and it is proved that defendant did not use ordinary care in furnishing an animal for the purpose for which it was hired."

1. That defendants knew that it was not unusual for geldings out in the field to nip each other:

Q During the previous two years, did you notice any vicious propensity of Midnight?

A Not any more so than other horses. They all get a little cranky sometimes.

Q Explain what you mean by that.

A Well, I think more horses bite and kick more because they are jealous rather than whether they are male or female. I often wish they could talk because you just never know just what they are thinking. Quite often sometimes they are only playing. *The geldings particularly spend hours out in the field playing and kind of nipping each other.* A lot of people think they are fighting.
  . . .

A I might point out that even when we ride down the field, possibly five to ten horses at a time, sometimes a horse will even kind of go over and try to bite another horse. There is just no way you can keep it from it. No way you can know it is going to happen.

(Italics mine.)

2. Defendants admitted that Midnight was to be "stalled":

Q Now, do you remember where the horse Midnight was kept?

A Well, actually, most of the time if they can afford, all the kids would like to have the stall, but if they can afford—we do charge extra, $10, because of sawdust and things, and Midnight was kept in a stall.

Q He was a stall horse?

A Yes.

3. Defendants admitted that they did not care if the creek fence was up or not, which fence could have prevented Midnight from entering the riding area: (Kelly—cross)

Q Well, what is your practice? Is it to keep it across there and have that gate system or is it to have it down?

A Like I say, it is so wet out there that it is quite a problem keeping the grass, you know, growing, and so when it is wet we try to keep it closed so the horses

don't get in it and tear up the pasture. Otherwise, we really don't worry about it.

Q *Otherwise you don't care whether it is open or not, I take it?*

A No.

(Italics mine).

4. Defendants admitted there had been prior incidents with riderless horses:

Q Had you ever had problems prior to this accident with riderless horses in the fields before?

A There have probably been incidents. I don't remember any right now.

Q You say there probably have been incidents?

A Over the years there must have been. *Somebody must have—some horse must have tried to bite another horse, I am sure.*

Q How about with another horse that had a rider on?

A *That, too.* In fact, I am sure our children have had horses bite at their horses when they are riding.

Q *Did you take any precautions at all to keep the riderless horses out of the areas where the horses were being ridden?*

A *As a rule we chased them out because they can be a nuisance as people are riding and other horses are eating.*

(Italics mine.)

5. Defendants never gave students any specific instructions what to do if chased by a riderless horse:

Q (By Mr. Oberquell) No. My question is whether your instructions related to being chased by a riderless horse.

A Well, I probably didn't everybody. I have no way of knowing. I can't remember everything.

Q Did you to Barbara?

A I really wouldn't know. Over the hundreds of people, I couldn't—

Q Did you give any specific instructions to Margaret as to what to tell people to do in a situation if they were being chased by a riderless horse?

A I don't know.

Q *Did you ever have any discussion with her as to whether or not there should be some written instructions as contrasted to just verbal instructions?*

A No. *Probably the larger stables do things better than we do. I don't know. We just don't have the time.*

(Italics mine.)

6. Defendants admitted that it was their ordinary procedure to keep the riderless horses away from where the lessons were being given:

Q I believe you stated that your procedure was to keep the riderless horses away from where the lessons were being given?

. . .

The Witness: *I said that we usually did.*

(Italics mine).

7. Prior to February 3, 1973 (the day of the accident) defendants had incidents of riderless horses interfering with patrons riding:

Q Page 15 I asked you commencing on line 13, "At the time of the accident of February 3rd, 1973, what was your custom and procedure regarding allowing riderless horses to be in where people are riding horses?" And you answered, "Our horses are just like a bunch of big dogs. They just wander around."

A That is true.

Q So, that was your custom and procedure, to let them wander wherever they wanted to?

A *Well, there again if I had time and I thought they would be a nuisance, I would chase them out of the field or have somebody do it.*

Q *On page 16 commencing at line 11, I asked you, "Did you ever have any occasion prior to February 3, 1973, of a riderless horse coming in and interfering with the riding in any way?" And you answered, "Yes, I think so."*

(Italics mine.)

8. Procedure when riderless horses wandered into instruction area:

Q And what was your procedure as far as having riderless horses in there when you were giving instructions?

A *If they wandered into the area where I was teaching, I would shoo them away.*

(Italics mine.)

From the above testimony, if believed, it is clear the jury could find that defendants knew of prior incidents where riderless horses had come into the area where students were practicing their lessons, and nipped other horses, and that in the subject case defendants were negligent in not taking proper precautions to protect the public in general, and plaintiff in particular, in keeping riderless horses out of the riding area, which caused plaintiff's injuries. The jury could have determined, from the evidence, that by keeping the gate closed between the area where horses were boarded and the instruction area, plaintiff's accident would have been prevented.

The above cited testimony constitutes substantial evidence of defendants' (1) duty to keep riderless horses from the instruction area, (2) failure to take adequate steps to prevent the horses from entering the riding area, and (3) breach of duty causing plaintiff's injuries.

To merely post a sign reading "Ride and visit at your own risk" is an attempted disclaimer of defendants' future negligence, which is against public policy and will not be enforced. *Ramsden v. Grimshaw,* 23 Wn.2d 864, 162 P.2d 901 (1945); *King Logging Co. v. Scalzo,* 16 Wn. App. 918, 561 P.2d 206 (1977). In any event, the jury by their verdict found the sign totally inadequate to advise students paying for riding instructions of the particular danger the owner had in mind.

As there is substantial and credible evidence to support the jury verdict, it should be reinstated.

I would reverse and reinstate the verdict.

Petition for rehearing denied October 17, 1978.

Review granted by Supreme Court February 16, 1979.