[No. 30433-0-I.    Division One.    July 26, 1993.]

SHELLEY PATRICK, *Appellant,* v. GLORIA SFERRA,
ET AL, *Respondents.*

*Stephen K. Kortemeier* and *Loucks & Lamb,* for appellant.

*Kathleen M. Boyle* and *David F. Ross,* for respondents.

FORREST, J. — Shelley Patrick (Patrick) appeals an order granting summary judgment and dismissing her claims against Gloria Sferra and Patrick J. Sferra (Sferra) and Gwyenne Ofsthus and John Doe Ofsthus (Ofsthus) arising from the gift of an ex-racehorse named Duke, also contending that the trial court erred in denying her motion for change of venue. We affirm, finding that the equine activities statute is inapplicable, there was no duty to warn, any failure to warn of Duke's alleged dangerous propensities was not the proximate cause of injury, the breach of warranty of fitness for a particular purpose is inapplicable because neither Sferra nor Ofsthus was a seller and this transaction was not a sale, and finding Patrick's assignment of error regarding change of venue was frivolous.

## FACTS

Patrick was given a certificate good for 1 month of unlimited horseback riding on a "safe horse" to be provided by Sferra, who operates a stable. Patrick redeemed the certificate in July 1987. Sferra rode with Patrick once, then allowed Patrick to ride Piper, the safe horse Sferra provided pursuant to the certificate, unaccompanied. At some point, Sferra showed an ex-racehorse named Duke, who was owned by Ofsthus and boarded by Sferra, to Patrick. Sferra asked Patrick if she would like to own Duke someday, suggesting that she could do so if she assumed responsibility for Duke's board and care. Patrick was enthusiastic about owning Duke; her only concern was the cost.

Patrick's 1-month riding certificate expired at the end of August. Prior to that, however, Patrick had begun riding Duke daily, and on September 8, 1987, Ofsthus formally

gave Duke to Patrick. The gift is evidenced by a handwritten memorandum purporting to sell Duke to Patrick for $10,[1] and the jockey club ownership certificate showing a transfer of ownership from Ofsthus to Patrick. Prior to the transfer, Ofsthus told Patrick that Duke was a retired racehorse, and that Duke should be walked for a year to give his ankles and shins an opportunity to heal.

After the transfer of ownership, Patrick continued to ride Duke daily on and around Sferra's farm, and continued to board Duke at Sferra's stables. However, Patrick ignored Ofsthus' advice on walking Duke. Scott Goodrich, an expert rider, rode with Patrick and testified that she allowed Duke to run and even jump low obstacles. In mid-September 1987, Patrick panicked after Duke acted up during a ride. Patrick dropped Duke's reins, put her arms around his neck, and allowed Duke to run back to the stables. Patrick did not report the incident to Sferra or Ofsthus.

On September 24, 1987, Patrick was riding on land adjacent to Sferra's farm with Shirley Mason. When Duke began acting up, Mason suggested they return to the stables. Patrick refused, and they continued their ride. Duke again acted up, and Patrick began circling him to regain control. After a short time, Patrick dropped Duke's reins, put her arms around his neck, and allowed him to run. When Duke jumped an embankment, he and Patrick fell to the ground. Patrick was knocked unconscious, spent 8 days in a coma, and sustained brain damage as a result of her fall.

Patrick filed suit against Sferra and Ofsthus, seeking damages for negligence under the equine activities statute, RCW 4.24.530-.540, breach of contract, breach of implied warranty of fitness for a particular purpose, and violation of the Consumer Protection Act.[2] Sferra and Ofsthus answered, and moved for summary judgment. Patrick opposed the motion and requested a change of venue for trial because Sferra was a part-time jury clerk for King County Superior Court.

---

[1] Despite this, Patrick does not claim the transaction was a sale.

[2] Patrick did not pursue the Consumer Protection Act claim on appeal.

A visiting judge reserved ruling on Patrick's change of venue motion, heard argument on the summary judgment motions, and granted Sferra and Ofsthus' joint motion on all four causes of action.

Patrick appeals the grant of summary judgment to Sferra and Ofsthus, and appeals what she terms the denial of her change of venue motion.

> When reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. A summary judgment motion can be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The court must consider the facts in the light most favorable to the nonmoving party and the motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion.

*Commodore v. University Mechanical Contractors, Inc.*, 120 Wn.2d 120, 123, 839 P.2d 314 (1992). Applying this standard, we affirm.

### EQUINE ACTIVITIES STATUTE

Patrick's principal theory of liability is based on the equine activities statute.[3]

Patrick asserts that Sferra and Ofsthus are "sponsors", that they "provided" Duke to her without having made reasonable efforts to determine that Duke was suitable for her use. We disagree. As a preliminary matter we note that the plain purpose of the act is to limit liability and not to expand it. After a sweeping and broad definition of "sponsor" it provides that sponsors and equine professionals shall not be liable except as specifically provided in the act. The exception to nonliability relied on by Patrick reads as follows:

> (b) Nothing in subsection (1) of this section shall prevent or limit the liability of an equine activity sponsor or an equine professional:

---

[3]RCW 4.24.530, .540. "Equine activities", as defined by the statute, includes boarding horses, and "rides . . . or other equine activities of any type however informal or impromptu that are sponsored by an equine activity sponsor." RCW 4.24.530(2). Stable operators are included within the definition of "equine activity sponsor". RCW 4.24.530(3).

> (i) If the equine activity sponsor or the equine professional:
> (A) Provided the equipment or tack and the equipment or tack caused the injury; or
> (B) Provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity, determine the ability of the equine to behave safely with the participant, and determine the ability of the participant to safely manage the particular equine;
> (ii) If the equine activity sponsor . . . owns, leases, rents, or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of a dangerous latent condition which was known to or should have been known to the equine activity sponsor . . . and for which warning signs have not been conspicuously posted[.]

RCW 4.24.540(2)(b). As to subsection (2)(b)(i)(A), the record is somewhat unclear as to just how much of the tack was provided by Sferra; however, it is immaterial because there is no evidence in the record establishing any causal connection between the tack and the injuries.

██ During the time Patrick was riding pursuant to the auction certificate for 1 month of free riding, Sferra, as a stable owner and operator, provided the equine, and was subject to the statutory duties. If this incident had occurred during that period, there would be a jury issue as to whether Sferra had fulfilled her statutory obligations. However, even during that period, it is doubtful that Ofsthus, as the uninvolved owner of Duke, could be found liable. For liability to attach to Ofsthus, she would have to fall within the definition of equine activity sponsor, which is one who:

> sponsors, organizes, or provides the facilities for, an equine activity including but not limited to: . . . operators, instructors, and promoters of equine facilities, including but not limited to stables . . . at which the activity is held.

RCW 4.24.530(3). Significantly, the definition does not include providing the equine. We conclude, therefore, that providing an equine without more does not constitute the provider as a "sponsor". The whole thrust of the statute is to protect people and organizations who sponsor riding activities, and in neither the common sense nor the statutory sense

was Ofsthus doing so. Arguably, however, by allowing Sferra to use Duke to fulfill part of Patrick's riding experience to which she was entitled under the auction certificate, Ofsthus was sufficiently associated with the stable operator so as to incur liability. We need not resolve this issue, however, because we conclude that any responsibility under the equine activities statute terminated for Sferra and Ofsthus when Patrick accepted ownership of Duke on September 8, 1987.

At the time of her injury, Patrick was riding her own horse on land that was not owned or under control of Sferra. Patrick was free to board her horse at any stable she chose. When an owner rides her own horse, the stable owner is not providing the equine. On the face of it, Patrick's position would yield an extraordinary result: a stable operator would be liable to an owner riding her own horse, off the stable operator's property, merely because the stable operator brought the owner and the donor of the horse together. There is absolutely no language in the statute suggesting that any such responsibilities were intended.

■ While Ofsthus may possibly have "provided" Duke prior to the transfer of title, she clearly did not do so afterward. We reject Patrick's interpretation of "provide" to mean "to have previously given to." "Provide" within the context of the statute means to make available for use a horse that the sponsor either owns or controls. It does not encompass a horse that has previously been given or sold to the individual claiming damages.

■ Patrick alleges that there is a factual issue as to the wanton and willful negligence of the respondents.[4] Giving Patrick the full benefit of expert Paul Davis's testimony, at most Sferra and Ofsthus were charged with notice that *some* ex-racehorses may bolt if not adequately trained. There is absolutely no showing of any knowledge that Duke would bolt; indeed, even when Patrick learned that Duke might bolt, she did not inform either Sferra or Ofsthus. The horse

---

[4]RCW 4.24.540(2)(b)(iii).

had undergone some training, had been owned by an 11-year-old child and returned to Ofsthus without any complaint of bolting or other dangerous behavior. There is no reasonable inference from the facts before the court that the respondents were guilty of willful or wanton negligence.

Any responsibilities of Sferra and Ofsthus to the plaintiff under the equine activities act terminated when Patrick accepted title to Duke. The court did not err in granting summary judgment on this cause of action.

## NEGLIGENCE

■ Patrick claims the trial court erred in ruling that Sferra and Ofsthus were not negligent for failure to warn her of Duke's alleged dangerous propensities.

> The essential elements of a negligence action are (1) the existence of a duty to plaintiff; (2) breach of that duty; (3) resulting injury; and (4) proximate cause between the breach and the injury.

*Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). Whether a duty exists is a matter of law.

■ Patrick's claim that Sferra and Ofsthus had a duty to inform her of Duke's alleged dangerous propensities presents a question of first impression in Washington.[5] No case

---

[5]Patrick presents for the first time, in her statement of additional authorities, Restatement (Second) of Torts § 388 (1965). We are entitled to disregard her argument based on this authority because the argument was not presented to the trial court, or in the assignments of error and issues in her opening or reply brief. RAP 10.3(g).

However, even if we address her argument on the merits, the authority adds nothing. Restatement (Second) of Torts § 388 (1965) provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel . . . for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
>   (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
>   (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
>   (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

is cited from any jurisdiction imposing liability on similar facts. With the exception of *Hosmer v. Carney,*[6] as discussed *infra*, all the cases Patrick relies on concern a host's duty to warn a social guest, and are therefore not helpful because Patrick was not a social guest riding the host's horse, but an owner riding her own horse.[7] Patrick thus failed to establish Sferra and Ofsthus had a duty to her, necessary to a finding of negligence.

## PROXIMATE CAUSE

We have rejected Patrick's claim that Sferra and Ofsthus had a duty to warn Patrick that ex-racehorses are particularly dangerous, either under the equine activities statute or under the common law. However, even assuming a duty to warn, Patrick has failed to establish that any breach of such duty was the proximate cause of her injury.

Patrick knew that Duke was an ex-racehorse, although she asserts this knowledge was meaningless to her. She had ridden Duke for a substantial period of time prior to accepting title. Shortly after accepting ownership, an incident occurred which was almost identical to the one causing her injuries. On the earlier occasion, Patrick dropped the reins, grabbed the horse around the neck, and allowed Duke to gallop back to the stables. No conceivable warning from either of the respondents could be as vivid, precise and une-

---

Patrick cites no case applying section 388 to the factual pattern here present. Moreover, as discussed *infra*, Patrick made insufficient showing that Duke was dangerous or that defendants were aware he was dangerous. And, insofar as he was dangerous, Patrick had more reason to know that than either Sferra or Ofsthus. Furthermore, as discussed *infra*, riding a horse without using the reins to control it is not a "use of the chattel in the manner for which . . . it is supplied", according to Patrick's own expert.

[6]228 N.Y. 73, 126 N.E. 650 (1920).

[7]For example, Patrick cites *Hojem v. Kelly*, 21 Wn. App. 200, 205, 584 P.2d 451 (1978), *aff'd*, 93 Wn.2d 143, 606 P.2d 275 (1980), where a social guest was injured while riding the host's horse, on the host's property, after the horse spooked and bolted. The court affirmed a judgment in favor of the guest. The case is inapposite. Here, Patrick was riding her own horse, on property not belonging to Ofsthus or Sferra, and the horse bolted because of Patrick's actions.

quivocal as this incident. Yet Patrick did not voice any complaint to Sferra or Ofsthus that she had been misled or inadequately informed of Duke's characteristics as a result. Nor did she make any inquiry as to what this might mean as to her ability to safely ride Duke or what, if any, precautions she should take. Indeed, she did not even report the incident, possibly because she was violating the instructions she had been given to walk the horse for 1 year. Instead, she continued to ride daily until the date of the accident. Even with this knowledge, she was plainly satisfied that she could safely ride Duke. There was never any problem with Duke except on the two occasions when Patrick dropped the reins and grabbed the horse's neck. As her expert stated, that is the most egregious error a rider can possibly make, equivalent to letting go of the steering wheel of a moving automobile.

▮ On the day of the incident at issue here, Duke was "acting up", but Patrick rejected the suggestion of her riding companion that she turn back. This corroborates the testimony of Scott Goodrich that she did not seek or heed advice from those more experienced than she. After forcing the horse to circle in order to gain control of him, Patrick proceeded to repeat the exact action that had resulted in Duke's prior bolt to the stables: she again dropped the reins and grabbed Duke's neck. Construing the facts most favorably to the nonmoving party, we are unable to treat the dropping of the reins as an unequivocally deliberate act, although it is certainly the most plausible inference. Nonetheless, the undisputed facts that (1) she knew she had acquired a racehorse, (2) she violated the instruction that she was to walk the horse for 1 year, (3) she experienced a bolt when she previously dropped the reins, (4) after the first bolt she made no complaint or inquiry and sought no advice, (5) after several more days of uneventful riding of Duke she again proceeded to commit the same egregious blunder of dropping the reins, lead inexorably to but one conclusion: that any failure to warn was neither factually nor legally the proximate cause of her injuries. The trial court did not err in

granting summary judgment to Sferra and Ofsthus on Patrick's tort claim.

### BREACH OF WARRANTY OF FITNESS

■ Patrick asserts that both respondents are "merchants"[8] under the provisions of the commercial code and, hence, must be held to have made an implied warranty of fitness for a particular purpose, pursuant to RCW 62A.2-315. That warranty provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

RCW 62A.2-315. Patrick ignores the fact that RCW 62A.2 is the portion of the commercial code dealing with *sales*.[9] She cites no case applying the sales provisions of the commercial code to a gift. Indeed, in Washington it has been explicitly held that this warranty is applicable only to *sales* of goods. *Boyle v. King Cy.*, 46 Wn.2d 428, 282 P.2d 261 (1955).

This transaction was not a "sale", which is defined as "the passing of title from the seller to the buyer for a price". RCW 62A.2-106(1). This transaction was a gift, passing title without a price. Moreover, as to Sferra, there is absolutely *no* basis for finding that she is a "seller", which is "a person who sells or contracts to sell goods." RCW 62A.2-103(1)(d). By its terms, the implied warranty of fitness for a particular purpose is imposed only on sellers, and thus does not apply to this transaction.

---

[8]"[A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction". RCW 62A.2-104(1).

[9]RCW 62A.2-102, .2-103, .2-106. Notably there is no definition of gifts anywhere in the title. It is undisputed in this case that Duke was a gift. Even if there was some loose obligation to feed and provide for the horse, it certainly does not meet the definition of a contract contained in RCW 62A.2-106.

■ Furthermore, RCW 4.24.540(2)(b)(v)[10] specifically makes sponsors liable under products liability laws, but significantly does not make them liable under the sales act, RCW 62A.2. Thus, insofar as either respondent might fall within the equine activities statute's definition of sponsor,[11] the failure to specify liability pursuant to the commercial code suggests that the code does not apply.

■ The only case Patrick cites to support this claim is *Hosmer v. Carney*, 228 N.Y. 73, 75, 126 N.E. 650 (1920). The case does not support Patrick's claim. *Hosmer* held that when an animal known to have dangerous propensities is *sold*, the seller has a duty to inform the buyer of the animal's propensities. This is *not* a sale. Additionally, *Hosmer* held that if the person to whom the animal is transferred "knows, or before injury ascertains, the vicious character of the animal," the seller is not liable for any injuries resulting to the transferee. *Hosmer*, at 75. In Washington, horses are considered domestic animals, and as such are not presumed to be vicious or dangerous.[12] Thus Patrick had to affirmatively show Duke had dangerous propensities, and that Sferra or Ofsthus knew of those dangerous propensities.

· Although Patrick made a showing that Duke was not easily controlled by an inexperienced rider, uncontradicted evidence shows Patrick had ample opportunity to ascertain Duke's alleged "vicious character". Patrick rode Duke daily for approximately 1 month prior to the accident.

Moreover, after Patrick dropped the reins, Duke had bolted and carried Patrick back to the stables in an incident approximately 10 days prior to this incident. Patrick did not inform

---

[10]"Nothing in subsection (1) of this section shall prevent or limit the liability of an equine activity sponsor or equine professional:

". . . .

"(v) Under liability provisions as set forth in the products liability laws[.]" RCW 4.24.540(2)(b)(v).

[11]RCW 4.24.530(3).

[12]*Hojem v. Kelly*, 21 Wn. App. at 205.

either Sferra or Ofsthus of the prior occurrence. Thus, Patrick had more knowledge than either Sferra or Ofsthus as to the particular dangerous propensity here at issue — bolting when the rider drops the reins. The daily contact with Duke, combined with the previous bolting incident, gave Patrick the opportunity to "ascertain[] the vicious character" of Duke, assuming Duke had such character. Indeed, the only indication of dangerousness was the fact that Duke bolted when the reins were dropped. The record does not support a conclusion that a horse is dangerous because he bolts when the reins are dropped. Indeed, the record supports a conclusion that dropping the reins is tantamount to surrendering control of the horse. Even if the *Hosmer* holding is applied to a gift, Patrick's knowledge of Duke's propensity to bolt when the reins were dropped defeats liability. Accordingly, the trial court did not err in granting Sferra and Ofsthus' motion for summary judgment on this cause of action.

## VENUE

Patrick assigns error to the denial of her motion for change of venue on the basis that Sferra was a part-time King County courthouse employee. In fact, the motion for change of venue was not denied, but was continued until after the summary judgment motion was ruled on. Patrick offers no facts to suggest that every King County judge was disqualified merely because Sferra was a courthouse employee. The assertion is pure speculation. In any event, there was no trial, the summary judgment motion was heard by a visiting judge so there is absolutely no basis for her claim that she was deprived of any rights, nor for her assertion that there was an appearance of unfairness. The assignment of error is frivolous.

Affirmed.

COLEMAN and KENNEDY, JJ., concur.

Review denied at 123 Wn.2d 1008 (1994).